# Troutman's Administratrix v. Louisville & Nashville Railroad Company.

(Decided February 5, 1918.)

## Appeal from Kenton Circuit Court (Common Law and Equity Division).

1. Master and Servant.—Duty of Master to Injured Servant.—A railroad company is under a duty to exercise reasonable care to save the life of an injured servant by furnishing medical treatment and attention.

2. Master and Servant—Duty of Master to Injured Servant.—In the absence of a statute or contract imposing this duty, it arises out of a humane principle that forbids the master to neglect his injured servant, and it is immaterial whether the injury was caused by the negligence of the master or the conduct of the injured servant in the course of his employment, and the duty lasts until the emergency created by the injury has passed.

3. Master and Servant—Duty of Master to Injured Servant.—The same measure of duty and care exists when the company undertakes to assume control of the case, although under the conditions present at the time it might not have been under any duty to furnish medical aid, as would exist in a state of case in which it would, in the first instance, have been under such duty.

4. Master and Servant—Duty of Master to Injured Servant.—The duty to care for and give medical aid to an injured servant should not be confined to the railroads, but should be extended to all corporations engaged in hazardous businesses.

5. Master and Servant—Duty of Master to Injured Servant.—The relation of master and servant does not terminate the moment the servant is made incapable of performing his duties by an injury. The master in the face of such a misfortune, no matter whose fault caused it, must exercise the same reasonable care to save his servant from further harm or death that he would have been required to exercise if his servant had not been injured.

6. Master and Servant—Duty of Master to Injured Servant.—If members of the family of the injured man are present when the accident occurs, or come to him before his removal by the company, or thereafter, and they express a desire to take charge, the servants of the company should deliver over to them the care of the case and do what they advise; and so the wishes of the injured man should be observed if practicable. If, however, the company assumes control of the case, this assumption of control carries with it the duty of exercising the required care in its performance.

7. Master and Servant—Duty of Master to Injured Servant.—The conductor of a railroad train, by which a servant is injured, has the authority to take such action as is necessary to afford relief

and medical treatment, and the company will be bound by what he does.

8.  Master and Servant—Duty of Master to Injured Servant.—
    Where an employe of a railroad company was injured by
    a train, and his wife, who came to the place of the injury soon
    afterwards, consented that the conductor might take the injured
    man to a hospital some miles distant, where he died, the company
    should not be held liable in damages for his death on the ground
    that it was caused by his removal from the place of the accident
    to the hospital at a time when a doctor who had been summoned
    was on his way to the place of the accident.

9.  Master and Servant—Duty of Master to Injured Servant—
    Pleadings and Evidence.—Where the cause of action is founded
    on the ground that the death of the injured employe was
    caused by his removal from the place of the accident to a hos-
    pital, it was incumbent on the plaintiff to show that he would
    probably have lived except for the removal.

SHERMAN T. McPHERSON, EDGAR W. CIST, CHARLES M. CIST and MYERS & HOWARD for appellant.

S. D. ROUSE and BENJAMIN D. WARFIELD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Archie Troutman, while in the employ of the defend-
ant railroad company as a foreman of track repairmen,
in attempting to board a moving freight train for the
purpose of going to a place on the track where his at-
tention was needed, was thrown under the caboose, the
wheels of which ran over his legs, virtually severing both
of them from his body, and from the effects of the injur-
ies so received he died a few hours afterwards.

Some time after this his widow as administratrix
brought this suit against the railroad company to recover
damages for his death which, as alleged, was caused by
the negligence of the railroad company through its ser-
vants in failing to render or permit to be rendered neces-
sary medical aid to the decedent. The petition charged
that while the decedent was in the employ of the com-
pany as a track repairman, and in the performance of
his duties, he attempted to board a moving freight train
for the purpose of being carried to a place where the
track was out of repair and in the attempt was thrown
under the caboose, which ran over his legs, severing the
same at or near his knees, which caused the blood to
flow from his body in large quantities and required the
immediate attention of a physician or surgeon to treat
the wounds and stop the flow of blood.

That immediately, or very soon, after he suffered this injury "the servants and employes of the defendant, including its conductor in charge of said train, took possession of and assumed the exclusive charge of the care of said decedent and attention to his wounds. Said conductor failed and refused to send for the nearest or any physician in accordance with the rules of defendant governing his conduct, and as was his duty in such cases, but placed one of his crew in charge of an engine and caboose as acting conductor thereof and put said decedent in said caboose, and gave said acting conductor instructions to take decedent to Latonia station. Before said engine and caboose left said Independence station, said conductor, and the said acting conductor were informed and knew that a physician at Independence had been called by telephone and was on his way and would shortly arrive at said Independence station, but said conductor and said acting conductor refused to wait for said physician, and just before his arrival the said acting conductor left said Independence station and carried said decedent in said caboose to Latonia station, a distance of eight or nine miles, and sent for a physician there. During the time that plaintiff's decedent was riding in the caboose to Latonia, plaintiff's decedent lost a large quantity of blood, the flow of which was enhanced by the rough ride in said caboose, and said loss of blood caused his death as aforesaid."

The answer was a traverse of the material averments of the petition.

After the pleadings were made up, the case went to trial before a jury, and upon the conclusion of the evidence introduced in behalf of the decedent's estate, the trial judge ordered a verdict for the railroad company, which was followed by this appeal.

Before stating the law that we conceive to be applicable to the case as presented by the record, we think it proper and convenient to set out at some length the facts as shown by the evidence, because in cases like this, and, indeed, in many other cases, it is necessary to have a clear understanding of the facts in order to adjudge in a satisfactory way the law of the case.

The accident happened in the daytime near a small station called Independence, and in view of the house in which the decedent lived. His wife saw the train when it suddenly stopped, and apprehending that some-

thing serious had happened, went immediately to the place where the train was. When she reached there, she saw her husband, the decedent, and also the conductor, and four or five other persons who were around her husband. She testifies that her husband told them not to cry, that he would be all right as soon as he got a doctor; that Fred Beach, one of the men who were standing by, told the deceased that he was going for a doctor and immediately started; that the nearest doctor lived about a mile and a half from the place; that after Beach started for the doctor the train crew uncoupled the engine from the train, which was going south and attached it to the caboose on the north end of the train and were in the act of putting the decedent in the caboose for the purpose of taking him to a hospital at Latonia, seven miles north of the place where the accident occurred, when Beach got back and said to the decedent, in the presence of the train conductor, "I got the doctor."

That the conductor was present when Beach said he was going for a doctor and was also present when he came back and said he had gotten a doctor; that Beach said to the conductor: "The doctor is coming; ain't you going to wait for him?" and the conductor replied, "To hell with your doctor. No, I am not going to wait for your doctor; I am going to take this man to the hospital." That then they put him in the caboose and she got in, and they started to Latonia in a few minutes, the engine pulling the caboose; that when they had gone a short distance the conductor asked decedent if he had lost anything, and he replied that he had lost his watch, and the conductor said: "I will stop the train and get it," and decedent said, "Don't stop and fool with my life;" that the train stopped long enough to let one of the trainmen get off and then went on to Latonia without waiting for the man who went after the watch to get on.

That on the journey a good deal of blood flowed from the wounds of the decedent, but he seemed to be in good spirits when they started and for some little time afterwards; that they got to Latonia in about thirty minutes after they started and were there met by a surgeon with an ambulance, and the decedent was taken to a hospital in Latonia where he died within a few minutes; that the

engine and caboose started to Latonia about fifteen or twenty minutes after the accident.

Birdie Troutman, a near neighbor of decedent, who lived within a few steps of where the train stopped, ran to it when she saw it stop and saw the decedent. She testifies that she heard Beach say he was going for the doctor and supposed that the conductor and the other members of the train crew who were present also heard him say so; that when he came back and said the doctor was coming the conductor said, "Doctor, hell; we are going to take him to the hospital;" that his wife asked if she might go to the hospital with him and the conductor said she could; that they did not wait for the doctor but started for Latonia as soon as the engine could be brought from the other end of the train and coupled to the caboose; that Dr. Petty, who lived a mile and a half away, arrived in a few minutes after the train had started; that the decedent when he left on the train was laughing and waving his hand at them and "told them not to worry; that he would be all right when he got to the doctor;" that his legs bled more when he moved than when he was sitting still; that she did not see any person use any cord or know whether any cord was put about his legs, which were covered with a towel.

Fred Beach, a friend of the decedent, got to the scene of the accident very soon after it happened and found the decedent lying on the side of the track. He said that he at once started for a doctor, after first saying he was going to get one; that the doctor lived a mile and a half from the place of the accident and he went to probably three houses to telephone to the doctor before he was able to find a telephone over which he could get him; that after he had succeeded in locating the doctor he went back to the train and told them that he had telephoned to the doctor and he was on his way; that he heard some one say, he did not know who it was, that they did not want any doctor; that they were going to take him to Latonia, for which place the train immediately started.

Henry Troutman, also a friend of decedent who reached the place of the accident before the decedent had been removed, found him sitting on the bank. He said that the crew tried to put some bandages around his legs but that it did not amount to much; that when

the train left Independence the decedent was talking freely and seemed to be cheerful; that his legs did not bleed much while he was sitting on the bank, but that when they moved him into the caboose they bled quite freely; that the decedent, when injured, was attempting to board the train for the purpose of being carried to a place about a mile distant to look at some bad track under his supervision, to the condition of which his attention had been called a few moments before.

Dr. Petty, who was at his home, a mile and a half from Independence, the place of the accident, said that as soon as he received the message over the telephone, he got in his machine and came at once in answer to the call; that it probably took him about six minutes; that when he reached the place he was told that the train had just started to the hospital. He further said that in the treatment of accidents such as the decedent suffered, the first thing to be done was to stop the flow of blood, and this he was prepared to do with instruments in his possession at the time.

In answer to a hypothetical question he said that in his opinion the decedent died from loss of blood, although a case such as was described in the hypothetical question had never come under his observation; that he could not say whether the decedent would have lived or died if he had remained at the place of the accident until he reached there and had been able to administer some relief; that the injuries as described to him were very dangerous.

Dr. Eckman, who was introduced as an expert, testified, in substance, the same as Dr. Petty.

The foregoing is a resume of all the evidence that was introduced, no member of the train crew being examined.

From the excerpts taken from the pleading and the evidence it will at once be seen that the case for the plaintiff was put solely upon the ground that the train crew, after assuming to take charge of the decedent, failed to exercise reasonable care for his protection and safety when they undertook to carry him from the place of the accident to the hospital at Latonia instead of waiting until the doctor that had been sent for arrived, as there is no claim that the railroad company or its servants were guilty of any negligence or want of care after the train left the place of the accident on its way

to Latonia, or in the treatment the decedent received after he reached Latonia.

So that the case on the facts narrows down to the single question whether it was negligence to remove the decedent under the circumstances stated from the place of the accident to the hospital at Latonia. If it was not, clearly the ruling of the trial judge was correct, because there is no other claim of negligence.

Before, however, determining this question of fact we will dispose of the argument made by counsel for the railroad company that it was under no duty to exercise reasonable care, or any care, to save the life of the decedent or furnish medical treatment for him, and, therefore, it is not to be held accountable for what its train crew did, even if it should be conceded that they were guilty of negligence, or failed to exercise reasonable care in their efforts to afford relief to the decedent.

If, as contended for the railroad company, it was under no duty to furnish medical aid to the decedent or to alleviate his suffering, or endeavor to save his life, it would seem to necessarily follow that it could not be held accountable for anything that its servants, the train crew, did or did not do in an effort to furnish medical aid for the decedent, or to relieve his suffering, or to save his life, because, assuming the soundness of the principle contended for, the train crew in everything they did were acting entirely outside the line of their duty and the scope of their employment.

As it does not appear that the railroad company was under any contract duty or obligation to furnish medical aid or assistance to the decedent, and there is no statute dealing with the subject, this issue presents purely a question of law, viz.: Is a railroad company, in the absence of any contract obligation or a statute regulating the subject, under a legal duty to use reasonable care in furnishing medical aid and suitable attention to its employes who are injured in the course of their employment, although the injury may not have been caused by the negligence of the company?

We may here, however, stop to say that, in our opinion, if the duty exists, it applies to all servants who are injured in the course of their employment, although the injury may not have been caused by the negligence of the company. There does not seem to us any room for distinction between the duty owing to an injured

employe whose injuries were caused by his own conduct, and for which the company might not be legally responsible, and its duty to an employe who was injured by the negligence of the company, for which it would be legally responsible. We say this because the duty, if it exists at all in the absence of contract or statute, arises out of a humane principle, engrafted into the law for the protection and safety of railroad employes, which continues the relation of master and servant after the servant has been injured and at least until the emergency created by his injury was passed, thereby putting upon the company the duty of exercising reasonable care to do everything that ordinary prudence and care would require to save him from the consequences of the injury after it has happened.

We are also of the opinion that the same measure of duty and care exists when the company undertakes to assume control of the case and take charge of the injured employe, although under the conditions present at the time it might not have been under any duty to furnish such medical aid or attention, as would exist in a state of case in which in the first instance it would have been under such duty, because the voluntary assumption of an unrequired burden may impose the same obligations as the assumption of a required duty.

Turning now to the law of the case we find that in this state the precise question here involved is a new one, although the court has expressed the opinion that corporations and masters other than railroad companies are under no duty to minister to the wants of employes who are injured in the course of their employment.

Thus in Godshaw v. J. N. Struck & Bro., 109 Ky. 285, the question was whether Struck & Bro., doing business as a private corporation, was liable to a physician employed by its foreman to give medical attention to one of its employes who was injured in the course of his employment. The court, while recognizing that railroad companies occupy towards their injured servants a different attitude in this respect from other employers, said, in holding that the foreman of Struck & Bro. had no authority to employ at its expense a physician to give attention to its injured employe, that:

"We are not, therefore, prepared to hold as a matter of law that the employment of physicians or surgeons for injured employes comes within the scope of the duties of a general manager of an ordinary manufacturing business. It seems to us that the rule that appellant seeks to have applied to this case is confined exclusively to railroad companies, and, generally, in cases which involve some act of negligence on the part of the company which occasioned the injury. . . . We, therefore, conclude that Struck & Bro. was primarily under no legal obligation to secure medical attention for Schnarvel, and that its foreman had no authority, express or implied, to make any contract in reference thereto which would be binding upon it." To the same effect is Lithgow Mfg. Co. v. Samuel, 24 Ky. L. Rep. 1590.

Cases from other courts holding the same doctrine are Cushman v. Cloverland Coal & M. Co., 170 Ind. 402, 16 L. R. A. (N. S.) 1078; Davis v. Forbes, 171 Mass. 548, 47 L. R. A. 170; Spelman v. Gold Coin Mining & Milling Co., 26 Mont. 76, 55 L. R. A. 640.

The Missouri Supreme Court, however, in Hunicke v. Meramec Quarry Co., 262 Mo. 560, extended the rule generally confined to railroads to other industries. In that case Hunicke, an employe of the quarry company, sustained severe injuries while engaged in the course of his employment, and the question before the court was what duty, if any, the quarry company was under to render to him medical assistance, and the court said:

"When an employe is engaged in any dangerous business for the master, and while in the performance of his duties as such, he is so badly injured that he is thereby rendered physically or mentally incapable of procuring medical assistance for himself, then that duty, as a matter of law, is devolved upon the master, and he must perform that duty with reasonable diligence and in a reasonable manner, through the agency of such of his employes as may be present at the time. In other words, without trying to state the law in detail governing the master's duties in all cases of this character, that duty is put in operation whenever, under the facts and circumstances of the case, the employe is thereby so injured that he or she is incapacitated from caring for himself or herself, as the case may be. . . . The law is that just as soon as an in-

jury of this character occurs, it then becomes the duty of the master to furnish medical treatment, and if he neglects to use reasonable efforts to do so, and the evidence shows that in all reasonable probability that failure was the proximate cause of the death, then the defendant is liable."

In Ohio & Mississippi R. Co. v. Early, 141 Ind. 73, 28 L. R. A. 546, the administratrix of Early, an employe of the railroad company, who died from the effects of injuries received in the course of his employment, brought suit against the railroad company upon the ground that the company, although under a duty so to do, failed to exercise reasonable care to save the life of Early after he was injured. The court, in the course of the opinion in discussing the duty and liability of the company, said:

"While a railroad company is under no legal obligatin to furnish an employe who may receive injuries while engaged in the service of the company, with medical or surgical assistance, yet where a day laborer or employe has, by unforeseen accident to him while engaged in the line of his duty as such employe, been rendered helpless, the dictates of humanity, duty, and fair dealing would seem to demand that it should furnish medical assistance. Of course, this duty could not rest upon the master in ordinary cases, in the absence of a contract to do so, but should rest upon him only in extraordinary cases, where immediate medical or surgical assistance is imperatively required to save life or avoid further serious bodily injury. This duty on the railroad company only arises out of strict necessity and urgent exigency, where immediate attention thereto is demanded in order to save life or prevent great injury. The duty arises with the emergency, and with it expires." To the same effect is Tippecanoe Loan & Trust Co. v. Cleveland, C. C. & St. L. Ry. Co., 57 Ind. App. 644.

In Northern Central Ry. Co. v. State, 29 Md. 420, 96 Am. Dec. 545, Price, an employe of the railway company, while crossing the track at a grade crossing, was struck and received injuries from which he soon died. One of the questions in the case was the duty that railroad companies owe to injured men after accidents, and the court said:

"We are next brought to the question whether the defendant be liable for the negligence of its agents in their treatment and disposition of the deceased subsequent to the collision. This we think free from doubt or difficulty. From whatever cause the collision occurred, after the train was stopped, the injured man was found upon the pilot of the defendant's engine in a helpless and insensible condition, and it thereupon at once became the duty of the agents in charge of the train to remove him, and to do it with a proper regard to his safety and the laws of humanity. And if in removing and locking up the fortunate man, though apparently dead, negligence was committed, whereby the death was caused, there is no principle of reason or justice upon which the defendant can be exonerated from responsibility. To contend that the agents were not acting in the course of their employment in so removing and disposing of the party is to contend that the duty of the defendant extended no further than to have cast off by the wayside the helpless and apparently dead man, without taking care to ascertain whether he was dead or alive, or if alive, whether his life could be saved by reasonable assistance timely rendered. For such a rule of restricted responsibility no authority has been produced, and we apprehend none can be found."

Other illustrative cases on this subject are: Union Pacific Ry. Co. v. Cappier, 66 Kan. 649, 69 L. R. A. 513; Holmes v. McAlister, 123 Mich. 493, 48 L. R. A. 396; Depue v. Flateau, 100 Minn. 299, 8 L. R. A. (N. S.) 485; Salter v. Nebraska Telephone Co., 79 Neb. 373, 13 L. R. A. (N. S.) 545; Toledo, W. & H. R. Co. v. Rodrigues, 47 Ill. 188, 95 Am. Dec. 484; St. Barnabas Hospital v. Minneapolis Electric Company, 68 Minn. 254, 40 L. R. A. 388. In Labatt on Master and Servant, 2nd ed., vol. 5, sec. 1999, *et seq.*, there will be found an extended discussion of this subject, with numerous citations of authority.

From the cases referred to, it would appear that some courts, including our own, make a distinction between the duty a railroad company which is engaged in a hazardous business owes to an injured employe and the duty other corporations owe to their injured employes, based on the mere fact that one corporation operates a railroad and the other corporation is engaged in some other kind of business. As an original proposition it would

seem that there is little reason for this distinction, because it is a well known fact that there are many corporations engaged in businesses that are equally if not more hazardous than the business of railroading, and if the duty imposed on railroad companies to protect their injured employes exists merely because of the hazardous nature of the employment, there seems no good reason why other corporations engaged in businesses equally if not more hazardous should not be under a like duty to take care of their injured employes.

It, therefore, seems to us that if distinctions in this respect are to be made at all, the difference in the duty should not be put upon the ground that one corporation is engaged in operating a railroad, while another corporation is engaged in some other business, but that the duty should be extended to all corporations engaged in hazardous employments. In other words, the rule of equal liability under substantially similar circumstances should be applied to all corporations and employers of labor who are engaged in a hazardous business, and the rule of non-liability should be confined to corporations and persons not engaged in what are usually known as hazardous businesses.

It is true that this distinction has many difficulties in the way of its fairness and justness to employers and employes, and the application of it to particular cases would involve many questions subjecting the distinction to doubt and confusion. This, however, cannot be avoided so long as distinctions are attempted to be made between the duty that different classes of corporations or masters owe to their injured servants. It could, however, be avoided if the same rule were applied to all corporations and all masters, as we think it should be.

The courts have also found much difficulty in settling on a ground on which to rest the liability of the master in cases like this where there is no contract or statute imposing the duty of taking care of an injured servant. We think, however, it may well be put upon the ground that as it would be a cruel and inhumane act to leave a helpless servant who was injured in the course of his employment to suffer or die from want of care and attention, there is an obligation growing out of the relation of master and servant that puts upon the mas-

ter the duty of taking such reasonable care of the servant as the existing circumstances will permit.

The relation of master and servant does not terminate the very moment the servant on account of some injury received in the course of his employment is made incapable of performing his duties, and the master, in the face of such a misfortune no matter whose fault caused it, must exercise the same reasonable care to save the servant from further harm or death that he would be required to exercise if the servant had not been injured. If the master cannot without incurring liability wantonly, recklessly or negligently inflict harm on the servant while in the performance of his duty and when he is able to look out for himself, neither should he be allowed to wantonly or negligently abandon him to suffer or die when he is helpless and dependent, merely because he has been injured. The duty of the master should not end with the injury, but continues until the emergency created by the injury has passed and until the servant has been placed where he will receive such reasonable care and attention as his injury demands and the surrounding circumstances will permit. And at this point it would not be out of the way to say that it is a matter of public knowledge that many well managed corporations, including railroads, voluntarily and adequately assume the duty of taking care of their injured employes, and especially in cases of emergency where there is no one else to minister to their necessities.

Coming now to apply what has been said to the case that we have, our opinion is that when an employe of a railroad company is injured while attempting to perform some service within the scope of his employment, whether his injuries are due to his own want of care or to the negligence of the railroad company, the company through its superior servants immediately in charge at the place where the accident occurs, such as the conductor in this instance, is under a duty to take such action as may be reasonably necessary and sufficient under all the surrounding circumstances to furnish the injured employe medical aid and attention suitable to the injury received, if there are no members of his family present who are capable of performing and do undertake to perform this service; and this duty exists although there may be no contract obligation requiring it

or statute making it mandatory. We do not, however, undertake to lay down any rule as to the length of time this care and attention must continue. It is sufficient here to say that the duty to observe it springs out of an emergency, and a variety of circumstances may control its duration.

If, however, adult members of the family of the injured man are present when the accident occurs, or come to him before his removal by the company, or at any time thereafter, and express a desire to take charge of the injured employe, the servants of the railroad company present at the time should deliver over to them the care of the case and do what they advise. The wishes of the injured man, if he is capable of understanding the conditions, should also, of course, be respected, and such convenient and practicable arrangements made as he desires. In other words, the injured man and his family have the right to determine what course shall be pursued.

Accordingly, as the wife and friends of the decedent were at hand a few moments after the accident and were able and willing to take charge of the injured employe, the conductor would have had no right, in opposition to their wishes, to dictate what course should be pursued, or to take charge of the case. He might with propriety, as well as safety from liability, have left the injured man in the care of his wife and friends. It appears, however, that the conductor thought it best that the injured man should be taken to a hospital and to a place where he could have more skillful treatment and attention than was obtainable at Independence, and when he took charge of the matter, this assumption of control although with the consent of the injured man and his wife carried with it the duty of exercising the required care in its performance.

Let us see now if he did perform this duty in such manner as to acquit the company of liability.

What a railroad company must do in the exercise of reasonable care to furnish medical aid and assistance to an injured employe must necessarily depend on the time, place, character of the injury and surrounding circumstances, but whatever the time or place or circumstances, the legal duty is there, and unless the company performs this duty it may be required to respond in damages for its failure.

It is argued that the question whether the company exercised the required degree of care depending on the particular facts and circumstances of the case, was one for the jury, and, therefore, the trial court under the facts and circumstances of this case committed error in ruling it as a matter of law.

It has been settled time and again by this court that when there is room for reasonable difference of opinion, or, in other words, when men of ordinary intelligence might reasonably entertain different opinions as to what should be done or not done in the discharge of a duty, the question is for the jury, but if all the facts and circumstances developed in the case show that there could not in reason be any room for difference of opinion as to what should be done or not done, the question is for the court.

Now when we come to apply this rule to the facts and circumstances of this case, we are thoroughly satisfied that there cannot in reason be two opinions about the proposition that the conductor in his efforts to save the life of the injured man exercised such care as a person of ordinary prudence would have exercised under like circumstances. In fact, it would not be going too far to say that the conductor did more than he was required to do in the exercise of reasonable care. The evidence shows, as we think, that he did everything that was possible to save his life, and convincing evidence of this is found in the fact that the injured man himself, who at the time was in full possession of his mental faculties, approved what the conductor did, and in the fact that his wife, who was present, also approved it. If the decedent or his wife had said to the conductor, as they surely would have done if they had thought he was not doing everything that was for the best, that the injured man should be left in Independence until the doctor arrived, we have no doubt that the conductor would have gladly obeyed their request or the request of either of them. But neither of them made such a request. They apparently recognized that the conductor was doing the right thing and taking every precaution as speedily as possible to remove the injured man to a place where he could have the very best of treatment. In addition to this, several friends of the injured man were present and they also seemed to recognize the propriety of what the conductor did, because all that was said by any person

consisted of the inquiry put to the conductor, "Ain't you going to wait for the doctor?" to which the conductor replied, "No, I'm going to take the man to the hospital," and no other inquiry as to what was to be done or what could or should be done was made, nor did any person either object to or protest against taking him to the hospital.

It is very apparent from all this that the injured man, his wife and his friends all believed that it was best that he should be taken to Latonia, and all, in fact consented, tacitly at least, that he should be taken there. Under these circumstances to hold the company liable would be to penalize it for doing everything in its power to save the life of its injured employe.

It will be observed that in the course of the opinion we have not touched on the fatal failure of the evidence to show with anything like reasonable certainty that the injured man would have lived if he had not been removed from Independence. This feature of the case we did not find it necessary to discuss, although we think it should here be said that as the cause of action was predicated upon the fact that the death of the decedent was caused by the failure of the company to permit him to remain at Independence, at least until the doctor who had been summoned arrived, it was clearly incumbent upon the plaintiff, in order to make out her case, to show with reasonable certainty that if this course had been pursued the life of the injured man could have been saved. It may be true that the question whether his life could have been saved by permitting him to remain at Independence was so problematical that no witness, medical or otherwise, could answer it with absolute confidence, and that the most that any one could say would be merely an expression of opinion; but that there should have been, in order to make out the case for the plaintiff, some opinion on this subject by persons qualified to speak, we are quite sure.

The judgment holding that the plaintiff failed to make out a case is affirmed.

Whole court sitting, Judge Sampson dissenting.

### DISSENTING OPINION BY JUDGE SAMPSON.

The plaintiff in this action is seeking to recover damages for the death of her intestate occasioned, as it is claimed, by the failure of the appellee railway com-

pany to exercise reasonable care and diligence to provide for intestate, after his injury and in the emergency occasioned thereby, medical and surgical aid to save his life. Decedent was a faithful employe of the appellee railway company, and while in the line of duty was run over by the train of appellee and his legs cut off. He was bleeding moderately considering his wound, otherwise he was cheerful. His imminent danger from the hemorrhage was apparent. Appellee's conductor, in charge of the train which ran over decedent, took control of the injured man, and after fifteen or twenty minutes waiting, placed him in the cab of the engine and carried him a distance of eight miles to a hospital, occupying in the journey about thirty minutes, and in moving and jostling him on the train he was caused to and did bleed profusely and from the loss of blood died immediately upon arriving at the hospital. He lived only about fifty or sixty minutes after his injury, and death resulted from loss of blood.

No principle is better established or sounder in reason than that where a railroad company, after injuring one of its employes engaged in the performance of duty, undertakes to procure medical and surgical aid for the injured man, it is bound to use a degree of diligence and attention adequate to the performance of the undertaking and is bound to exercise itself in proportion to the exigencies of the matter it undertook. This principle is recognized by text writers and courts generally throughout the United States. It has often been held that where the railroad company assumed and undertook in emergency to procure medical and surgical aid for the injured, but was guilty of such negligence and carelessness in so doing as to cause or allow aggravation of the injury or death, it was responsible in damages for such negligence. The facts in this case bring it fairly within this rule. This liability is rested upon the emergency occasioned by the injury and not upon any general principle that the railroad company is liable for a failure to provide medical or surgical assistance. The injured person must be so incapacitated as to be unable to take care of himself, and the injury must be of such character as to create an emergency requiring immediate assistance. In the Tippecanoe Loan, &c. Co. v. Cleveland Railway Company, 57 Ind. App. 644, it is said: "If an employe of the railroad company is injured as a result of hazards to

which his employment exposes him, and if his injuries are of such a nature as to render him incapable of caring for himself, it becomes the duty of the company to take such steps as are reasonably necessary and proper under the circumstances to prevent aggravation of the injury through exposure, or for want of medical or surgical assistance. Under such circumstances if the servants of the company knowingly leave such injured person to die of exposure or to bleed to death from his wounds, a legal responsibility for such consequences will be imposed upon the company; and, if they take him into their custody, they must exercise reasonable care in the treatment accorded him. Under such circumstances the common instincts of humanity require that the helpless injured person should be taken in charge and removed to a place of safety and that, if necessary, medical or surgical aid should be provided. . . . It is said that the duty arises with the emergency, and with it expires.'' Ohio, Etc. R. Co. v. Early (1895) 141 Ind. 73; Terre Haute, Etc. R. Co. v. McMurry, 98 Ind. 358.

Troutman was not only an employe of the company, but was in the performance of his duties, as track foreman; he was injured by the train of defendant, and the conductor of this train, the chief agent of the company, present, took charge of decedent and over the objection and protest of neighbors and other persons present, carried decedent away to the hospital after the conductor had been informed by these neighbors and interested persons that a doctor had been called and would arrive immediately to give assistance. It required thirty minutes or more to travel from the place of injury to the hospital; the doctor called would have arrived in a moment or two, and in fact did arrive as the train was pulling out. Quick action was required. Life was ebbing away. It is admitted upon the demurrer to the evidence that the injured man came to his death through the loss of blood, and that the flow of blood could have been checked and his life saved by proper attention, such as the physician called could and would have rendered. It is in evidence also that the conductor knew the doctor had been called and that he would arrive at once to attend the injured man; and when requested not to remove the injured man, the conductor with an oath, superciliously refused and carried him away. Under this

state of fact, it is a question for the jury to determine whether the railroad company, through its agent, exercised that degree of care and diligence which it owed to decedent after it assumed charge and undertook the performance of that duty. If the railroad company in moving the injured man to the hospital, eight miles away and requiring thirty minutes or more to make the journey, did what a reasonably prudent person under all the circumstances attending the  case  would usually have done, then it was not liable; but if, over the protest of interested persons then present and without the consent of the injured man, the railroad company voluntarily took charge and with knowledge that a physician had been called to attend and would immediately arrive to render assistance, it, through its agents, carried the injured man away on a moving, jostling train, causing him to bleed to death, then it did not exercise that degree of care which a reasonably prudent person under such circumstances would have exercised,  and is liable in damages.   These facts and circumstances present a question for determination by the jury.   How the jury may have decided it is not of importance here.   It was a question of fact and clearly within the province of the jury, and the trial court erred in directing a verdict for the defendant company.

It owed the injured man diligence and care equal to the emergency.   Did it exercise such in carrying him away to the hospital when a reputable physician and surgeon was present to render immediate service?  What impelled the agents of the railroad company to refuse to allow the local physician and surgeon to serve the dying man, and carry him eight miles to the railroad surgeon, is unknown; but there was nevertheless a motive, good or bad.  If it was a rule or instruction of the company to its servants to carry an injured person to a surgeon in its employ rather than allow a surgeon not in the employ of the company to treat the injured, the propriety of such action, under all the circumstances, was one of fact for the jury.  The company having assumed charge of the injured man owed him the duty to act with diligence and care, and whether it did so under the facts in this case was for the jury.  The judgment, therefore, should have been reversed for a new trial.

For these reasons I dissent from the majority opinion.