## Stanley's Administrator v. Duvin Coal Company.

(Decided March 10, 1931.)

**814**

HENSON & TAYLOR and VERT C. FRASER for appellant.

WITHERS & LISMAN and J. C. CANNADAY for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON— Affirming

This is an action by the administrator of Joseph I. Stanley against the appellee for negligently causing his death by its failure to furnish necessary and proper medical attention to him as an injured employee.

Joseph I. Stanley was an employee of appellee in Webster county, and while so employed he was engaged in mining coal, on the 12th day of December, 1929, when coal fell on him, breaking both bones in his left leg below the knee, from which the flesh for some five or six inches was cut and lacerated. His fellow miners rendered him first aid, by putting bandages around his leg, and then putting it in splints. They carried him out of the mine within twenty minutes after he received first aid. While he was in the mine a physician was called by telephone. The regular physicians of appellee could not be reached by telephone, and Dr. Snow was communicated with and he arrived at the first aid building at the mine before Stanley was carried there from the mine. He was a graduate in medicine and surgery of the University of Louisville, and had been engaged in the general practice since his graduation. He had resided and engaged in his practice at Providence since 1919. On his examination, he found Stanley suffering from a compound fracture of his left leg. His testimony is so vital and important to a correct and proper determination of the question of first importance in this case, that we prefer to use his own language, which is as follows:

"Q. Were you called in to treat Joseph Iley Stanley? A. Yes, sir.

"Q. In December for a compound fracture, suffering from a compound fracture? A. Yes, sir.

"Q. What condition did you find him in? A. I was at the mine when they brought him out. I got out to the mine just a few minutes before they got him out. When they brought him out they had it

splinted up to about his knee on his left leg bandaged up.

"Q. Was he conscious at the time? A. Yes sir.

"Q. What was the condition of his heart action? A. He was just as nearly normal as you would find a fellow, his heart was good and his breathing good, he was perfectly conscious. He was in a good condition, but as dirty as could be.

"Q. Did he object to any treatment you gave him? A. No. sir.

"Q. Did he submit to your treatment without any objection at all? A. Yes sir.

"Q. Did you inform him he was going to the hospital? A. Yes sir.

"Q. Did he make any objection to going to the hospital? A. No. sir.

"Q. What did he say about going to the hospital? A. When I told him that he was going to have to go to the hospital he said 'Where are you going to send me' and Jimmie Gold said, 'They send their patients to Hopkinsville.' He said, 'I would like a little rather to go to Evansville because my brother or sister or some of his folks, are there.' And Jimmie says, 'They send all of them to Hopkinsville' and he said, 'That is all right then.'

"Q. Did he say anything to you, or you to him about you going with him? A. He wanted to know who was going to take him, and I told him they had sent for the ambulance and Mr. Montgomery.

"Q. Did he ask whether you were going? A. He said, 'Are you going along with me?' and I said 'No, I don't think it is necessary. Mr. Montgomery is going.' And he said, 'That will be all right.'

"Q. He agreed to that? A. Yes sir.

"Q. And made no objection whatever? A. No sir.

"Q. Did Mr. Aldridge say anything to him about you going along? A. He asked did I think it necessary to go with him and I said I didn't think so. There wasn't any bleeding and nothing showed it was necessary for me to go, that I could go but all that would be necessary was to send some fellow with him that so in going over rough places he could keep that leg from bouncing around.

"Q. There was nothing to indicate to you that he would suffer any later bleeding from that injury?

A. He wasn't bleeding and didn't bleed while dressing him and he hadn't bled any when he left, the dressing wasn't soiled at all.

"Q. What is to be generally and usually expected from such a case as this? A. They usually if an artery is cut they bleed.

"Q. Immediately? A. At the time when it is cut.

"Q. It would bleed then? A. Then.

"Q. Is it unusual to have them bleed later when they do not at the time? A. I never had one to.

"Q. You have had considerable experience in such case as this? A. Yes sir.

"Q. Doctor to what might this subsequent bleeding have been attributed? A. I don't know. There was nothing to indicate it was going to bleed. It hadn't bled any when they brought him out and I would say four tablespoons of blood would be a big amount from the time the dressing was put on in the mine until we got him dressed and left, and I doubt it bled that much.

"Q. Such bleeding as that, where was the bleeding coming from, artery or vein? A. It just kind of oozed a little from the edge of the wound.

"Q. From the capillaries and veins? A. Just out of the edge of the skin.

"Q. There was no deep bleeding at all? A. No. sir.

"Q. Is there any difference in the appearance of arterial bleeding and from the veins? A. Arterial bleeding is bright and venus dark.

"Q. What is the difference in the way they flow? A. If it is an artery of any size it spurts, and if it is a vein it is just a gradual ooze.

"Q. There wasn't any flowing of blood at all? A. No. sir, there wasn't any scarcely there."

At the time Stanley received his injury. John Aldridge was superintendent of the mine of appellee. As such he telephoned and secured the services of Dr. Snow before Stanley was removed from the mine. Stanley made no request of Mr. Aldridge and gave no direction to him as to whom he should employ to convey him to the hospital. He made no objection to being sent to the hospital. He was conscious at all times, and did not request to be sent to a hospital.

Mr. Montgomery, a man sixty years of age, and who conveyed him to the Hopkinsville hospital, owned his own equipment, which was modern and up to date. He had been engaged in operating an ambulance for about three years, but had been an undertaker for several years longer. He had studied anatomy and knew to a limited extent how to administer first aid, and how to stop the flow of arterial blood. His son, Earl Montgomery, was chauffeur of the ambulance and had had several years' experience in driving. Mr. Montgomery states there was no vibration or jolting of the ambulance more than usual on the trip to the hospital. He rode inside the ambulance with Stanley, who said nothing to him during the trip, except on one occasion he stated he was tired and asked assistance in turning over. He was conscious at least part of the time on the trip to Hopkinsville. At the time he asked for assistance in turning over he seemed to be strong. He seemed to fall asleep several miles before the ambulance reached Hopkinsville, but there was nothing to indicate he was not all right. He was breathing natural and gave no indication of losing blood. No examination was made of him while on the road. Hopkinsville is about fifty-five miles from appellee's mine. On arriving at Hopkinsville, he appeared to be sleeping soundly. When the physicians there examined him they found his pulse very feeble, hardly perceptible. His respiration indicated hemorrhage from either deficient blood or blood of defective quality. In their opinion his condition and death resulted from loss of blood. A metal posterior splint and dressing of antiseptic guaze and cotton were around his limb. He lived about three and one-half hours after his arrival.

On a trial before a jury, at the close of the evidence of appellant, the appellee entered its motion for an instruction directing the jury to find a verdict for it. The court overruled its motion. After the evidence in its behalf was introduced, it renewed its motion for a peremptory instruction which the court gave to the jury. The jury returned its verdict accordingly and judgment was entered in conformity thereto, from which this appeal was taken.

The appellant introduced in his behalf the appellee's superintendent. In behalf of appellee Dr. Snow testified.

The superintendent of appellee assumed authority to, and did, secure transportation for the injured servant

from the time he reached the first aid house at the mine until he was placed in the ambulance. Dr. Snow assumed control and management of the medical treatment required by his condition, and determined the necessity of placing him in the hospital at Hopkinsville. He determined whether it was necessary for some one to accompany him to the hospital for the purpose of giving medical treatment or special skilled attention to the patient while being transported to Hopkinsville. He informed Stanley of the necessity of his being taken to, and treated, at the hospital. On receiving this information from Dr. Snow, he inquired of the doctor, "Where are you going to send me?" Another miner, named Gold, who had assisted caring for him in the mine and after he arrived at the first aid house, responded to his inquiry, "They send their patients to Hopkinsville." Stanley stated, "I would a little rather go to Evansville because my brother, sister or some of my folks live there." Gold then repeated his remark, whereupon Stanley remarked, "That is all right then." Stanley wanted to know who was going to take him, and Dr. Snow told him they had sent for the ambulance and Mr. Montgomery. Stanley then further inquired of Dr. Snow, "Are you going along with me." And the doctor answered him, "No, I don't think that is necessary, Mr. Montgomery is going." Stanley then responded, "That will be all right."

Stanley made no statement to the superintendent as to the hospital he preferred, nor did he object, in his presence, to going to the hospital. The superintndent did not consult with him about where he would be sent, nor how he would be sent, nor who would be sent with him, nor did he consult any relative of Stanley. He had no information that Stanley preferred to go to the hospital at Evansville. Stanley was a single man and had no relatives at Providence, except an uncle.

The Duvin Coal Company usually sent its injured employees to the hospital at Hopkinsille for treatmnt. In this instance the superintendent followed the custom of the company. It was the custom to employ Mr. Montgomery and his ambulance to convey its injured employees from the mine to the hospital. Mr. Montgomery operates the only ambulance at Providenc. Occasionally appellee sent its injured employees to the hospital at Evansville, Ind. Mr. Aldridge gives as the reason for sending them to Hopkinsville, instead of Evansille,

that there was no ferrying required in making the trip to Hopkinsville.

Dr. Snow testifies that Mr. Aldridge, the superintendent, asked him if he (Dr. Snow) thought it necessary to go with Stanley, and Dr. Snow responded, "I don't think so." Dr. Snow states that at the time Stanley was placed in the ambulance he was not bleeding; nothing showed that it was necessary for him (Dr. Snow) to go, that he could see; that all that was necessary was to send some one along with him, so that in going over rough places he could keep his leg from bouncing around. There was nothing to indicate that he would undergo further bleeding from the injury. In addition to dressing his limb, Dr. Snow administered one-eighth of a grain of morphine and one-fiftieth of a grain of atrophine. It is conclusively shown that Stanley was himself mentally. It is also shown by the evidence that, while he was in the mine, and while he was receiving first aid, if not before, he inquired of his fellow miners if they thought he would have to go to the hospital. The question of his going, or having to go to the hospital, and of his being taken there, was not decided or determined by the superintendent of the mine, nor in the superintendent's presence. The other employees of the appllee who heard him discuss the subject of going to the hospital say that the superintendent was not present at the time, and it is not shown that the superintendent had information of Stanley's desires.

The appellant concedes that the appellee is not liable for any negligence of any physician or surgeon at the hospital. He makes no complaint of any negligence of Dr. Snow.

He urges that the giving of the peremptory instruction was error, and relies upon the cases of Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445; C., N. O. & T. P. Ry. Co. v. Cook's Adm'r, 73 S. W. 765, 24 Ky. Law Rep. 2152; Goins v. North Jellico Coal Company, 140 Ky. 323, 131 S. W. 28; Matlack v. Sea, 144 Ky. 749, 139 S. W. 930; Thomas' Adm'r v. Eminence Distillery Co., 151 Ky. 29, 151 S. W. 47; Troutman's Adm'x v. L. & N. R. R. Co., 179 Ky. 145, 200 S. W. 488. The rule in this state is: "When an employee of a . . . company is injured while attempting to perform some service within the scope of his employment, whether his injuries are due to his own want of care or to the negligence of the . . . . company, the company through its superior servants

immediately in charge at the place where the accident occurs, . . . is under a duty to take such action as may be reasonably necessary and sufficient under all the surrounding circumstances to furnish the injured employee medical aid and attention suitable to the injury received. If there are no members of his family present who are capable of performing and do undertake to perform this service; and this duty exists although there may be no contract obligation requiring it or statute making it mandatory." Troutman's Adm'x v. L. & N. R. R. Co., 179 Ky. 145, 200 S. W. 488, 494 and authorities cited.

"The general rule is that, where a master voluntarily assumes to provide medical service to its employees, such master is only bound to exercise reasonable care and diligence in the selection of a physician, and, when this duty is properly exercised, its liability ceases, and it is not liable for the subsequent malpractice or negligence of the physician so employed." W. U. Telegraph Co. v. Mason, 232 Ky. 237, 22 S. W. (2d) 602, 604, and cases cited therein. The appellant concedes that the appellee only owed to Stanley the duty of securing a competent physician, and that when this duty was performed its duty ceased. It concedes that the appellee is not liable for the malpractice or negligence, if any, on the part of Dr. Snow; he insists that Dr. Snow only rendered first aid, and that during that time and at all times the appellee had control and dominion over the medical treatment and care of its injured employee, and that therefore the appellee is liable for his death resulting from the loss of blood while being conveyed to the hospital. He insists that the evidence in his behalf warranted a submission of the case to the jury on this theory.

"The rule in this state is that, if the plaintiff makes out his case, however much the evidence for the defendant may overbalance that introduced by the plaintiff, he is entitled to have the jury pass upon the issue; and that the court cannot in such a case give a peremptory instruction, although he may be of opinion that, if the jury should find a verdict for the plaintiff, it should be set aside, and a new trial granted." Curran v. Stein, 110 Ky. 104, 60 S. W. 839, 840, 22 Ky. Law Rep. 1575; Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445; C. N. O. & T. P. R. R. Co. v. Cook's Adm'r, 73 S. W. 765, 24 Ky. Law Rep. 2152; Goins v. North Jellico Coal Co., 140 Ky. 323, 131 S. W. 28; Matlack v. Sea, 144 Ky. 749, 139 S. W. 930;

Thomas' Adm'r v. Eminence Dist. Co., 151 Ky. 29, 151 S. W. 47. It is an established rule that, if there is a scintilla of evidence, the case should be submitted to the jury. American District Telegraph Co. v. Oldham, 148 Ky. 320, 146 S. W. 764, Ann. Cas. 1913E, 376. The rule insisted for by the appellant harmonizes with another equally as well settled rule, i. e., if, when the case is submitted to the jury, it will be bound to find a verdict for the defendant under the proof, it is proper for the court to instruct the jury peremptorily to find a verdict for the defendant, or if the question is one of negligence or no negligence, and the evidence is equally consistent with either view, i. e., the existence or nonexistence of negligence, the court should instruct the jury peremptorily. I. & N. R. R. Co. v. Mounce, 90 S. W. 956, 28 Ky. Law Rep. 933; Rogers v. Felton, 98 Ky. 148, 32 S. W. 405, 17 Ky. Law Rep. 724; I. C. R. R. Co. v. Gholson, 66 S. W. 1018, 23 Ky. Law Rep. 2209; Sinclair's Adm'r v. I. C. R. R. Co., 129 Ky. 828, 112 S. W. 910; Reliance Coal & Coke Co. v. L. & N. R. R. Co., 203 Ky. 1, 261 S. W. 609, and authorities cited.

The applicability of these rules is determined by the facts in each particular case. The testimony of Dr. Snow is the only evidence showing or tending to show who treated Stanley, who determined his treatment or determined that hospital treatment was proper or required, or determined the necessity of a skilled or experienced person or a physsician accompanying him to the hospital. His testimony is not only all the testimony appearing on this question, but it is uncontradicted.

In Atchison, T. & S. F. Ry. Co. v. Zeiler, 54 Kan. 340, 38 P. 282, 285, the court said: "The transfer from the freight to the passenger train was made under his (Dr. Hunt) advice, and by his direction. Zeiler was started on his journey by Dr. Hunt. It was his duty to have examined the wound, and the condition of the patient, to have determined whether he was in a condition to endure the journey to Ottawa, or whether it would be better to remove him from the cars and amputate the limb at once. If it were determined that the journey should be made, it was his duty to see that the wound was properly dressed; that the patient was provided with those things that were necessary for his safety and comfort. . . . If there was excessive bleeding, which might have been prevented, during the hour's ride from

Wellington to Mulvane, was it the fault of the railroad company? It clearly was not the fault of the train hands, for they cannot be held to the exercise of any degree of medical or surgical skill. How can it be said to be the fault of the train master, or of any superior officer of the railroad company? They had called competent physicians, and were taking the injured man to the hospital in accordance with their advice. The law is well settled that a railroad company, having used reasonable care in his selection, is not chargeable with the want of skill in a physician or surgeon whom it calls for a passenger or injured employee, and this is so even where the law requires a steamship company transporting immigrant passengers to carry a physcian.''

The facts in the present case are practically the same as in the above. The uncontradicted evidence shows that the immediate cause of death of the deceased was his bleeding while on the way to the hospital. The evidence of Dr. Snow establishes beyond question that the character and extent of the medical treatment and the necessity of hospital treatment were determined by him. The court correctly treated these facts as established. Wasiota & B. M. R. R. Co. v. Blanton, 160 Ky. 134, 169 S. W. 589; Robenson v. Turner, 206 Ky. 742, 268 S. W. 341.

It is true that the superintendent of the appellee assumed all authority over the employing of the ambulance and the persons who should convey him to the hospital. But the necessity or propriety of his going to the hospital for treatment, and of some one to accompany him, and the treatment he should receive on the way, were left entirely with Dr. Snow. He received, treated, and directed the treatment to be given the injured servant while at the first aid house, and on the way to the hospital. His judgment prevailed exclusively in all these matters, and the appellee by its superintendent, did not, nor did any other employee, assume any authority in any of these matters at any time. The proof is such that, had the case been submitted to the jury, it would have been bound to have found a verdict, on the uncontradicted testimony of Dr. Snow, for the appellee. Sinclair's Adm'r v. I. C. R. R. Co., supra. A directed verdict was proper.

Wherefore, perceiving no error, the judgment is affirmed.